J-S50020-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| IN THE INTEREST OF: F.F.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: F.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 480 EDA 2017 |

Appeal from the Decree January 11, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-AP-0000206-2016

| | | |
|---|---|---|
| IN THE INTEREST OF: F.F.W., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| APPEAL OF: F.W., FATHER | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 483 EDA 2017 |

Appeal from the Order Entered January 11, 2017
In the Court of Common Pleas of Philadelphia County
Family Court at No(s):  CP-51-DP-0001439-2014

BEFORE:   PANELLA, MOULTON, and RANSOM, JJ.

MEMORANDUM BY MOULTON, J.:                    **FILED SEPTEMBER 26, 2017**

Appellant, F.W. ("Father"), appeals from the decree entered January 11, 2017, in the Philadelphia County Court of Common Pleas, granting the petition of the Department of Human Services ("DHS") and involuntarily terminating his parental rights to his minor, dependent son, F.F.W. ("Child"),

born in September 2012, pursuant to the Adoption Act, 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b).[1]   Father also appeals from the order entered January 11, 2017, changing Child's permanency goal to adoption pursuant to the Juvenile Act, 42 Pa.C.S. § 6351.  We affirm.

The trial court summarized the relevant procedural and factual history as follows:

> The family in this case became known to DHS in 2010, prior to Child's birth in September 2012.  DHS received General Protective Service ("GPS") reports addressing situations related to Child's siblings.  At a hearing in November 2011, Child's siblings were not determined dependent.  On April 15, 2014, [M]other was arrested for recklessly endangering a child and recklessly endangering another person, and was imprisoned at Riverside Correctional Facility.  On May 17, 2014, a dependency action was filed for Child's siblings.  Prior to incarceration in April 2014, [M]other left this child with Father.  Child remained in Father's care.  On June 18, 2014, DHS amended the siblings' dependency petition to include this Child.  On June 19, 2014, the court found Child's siblings to be dependent and ordered DHS to obtain an Order for Protective Custody ("OPC") for this Child.  DHS was unable to locate Child and was unsuccessful in attempts to reach Father.  On June 23, 2014, Father contacted DHS stating he had Child in his care since [M]other left Child with him before her incarceration.  Child had not seen a doctor in a year and Father did not know whether Child had received all of his immunizations, claiming it was Mother's responsibility.  Father would also leave Child in the care of paternal aunt, who has a lengthy criminal history,

---

[1] The parental rights of J.A.S. a/k/a J.S. ("Mother") to Child were also terminated on the same date by separate decree.  Mother did not file an appeal and is not a party to the instant appeal.

whenever he worked odd jobs. As of June 23, 2014, Father did not have stable housing or a job. Father has a criminal history beginning in 1992, whereby Father pleaded guilty to an indecent assault charge. In 2011, Father was found guilty of possession of marijuana.

On June 26, 2014, during a shelter care hearing, the OPC was lifted and temporary commitment to DHS was ordered to stand. On June 30, 2014, Child was adjudicated dependent based on present inability and was fully committed to DHS. Father appealed Child's dependency adjudication upon which the trial court was affirmed. Father was ordered to the Clinical Evaluation Unit ("CEU") for drug and alcohol, the Achieving Reunification Center ("ARC") for parenting, housing, anger management, employment, domestic violence and visitation with Child. At different permanency hearings, the trial court always found reasonable efforts on behalf of DHS. Father has been minimally compliant with the permanency plan and has not successfully completed his parental objectives.

Trial Court Op., 3/21/17, at 1-2 ("1925(a) Op.") (citations to record and footnotes omitted).

On March 1, 2016, DHS filed petitions to terminate parental rights and for a goal change. On January 11, 2017, the trial court held a termination/goal change hearing. DHS presented the testimony of DHS worker Yolanda Bronson-Williford and Children's Choice caseworker Juliana Keegan. DHS also admitted into evidence DHS Exhibits 1 through 6, 8 through 12, 14, and 15.[2] Father testified on his own behalf.[3] Mother, who was not present, was represented by counsel.[4]

---

[2] The remaining exhibits were related to Mother.

By decree and order entered January 11, 2017, the trial court involuntarily terminated the parental rights of Father pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b), and changed Child's permanency goal to adoption.[5]   On February 1, 2017, Father, through appointed counsel, filed timely notices of appeal of the decree terminating his parental rights and of the goal change order, along with a concise statements of errors complained of on appeal pursuant to Pa.R.A.P. 1925(a)(2)(i) and (b).   This Court consolidated Father's appeals *sua sponte* on February 14, 2017.

On appeal, Father raises the following issues for our review:

1. Did the Trial Court err[] as a matter of law and abuse its discretion by terminating Father's parental rights where the Department of Human Services (DHS) did not prove by clear and convincing evidence that Father had not relieved the circumstances which brought the child into care and could not rel[ieve] them within a reasonable amount of time?

*(Footnote Continued)* ───────────────

[3]  Father also presented Exhibit F-1, certificates related to his completion of parenting and anger management classes, and housing and life skills workshops.   Although this exhibit was not included with the certified record, it does not affect our disposition as the court took judicial notice of Father's completion.  N.T., 1/11/17, at 33.

[4] The court noted that it previously took testimony as to Mother and the termination of her parental rights on May 20, 2016 and held its decision in abeyance.  N.T., 1/11/17, at 24.

[5] We observe that, while the Permanency Review Order of May 20, 2016 indicates a change of goal to adoption, the subsequent two orders reflect a goal of return to parent or guardian.  Permanency Review Order, 5/20/16; Permanency Review Order, 6/24/16; Master's Recommendation, 10/7/16.

2. Did the Trial Court err[] as a matter of law and abuse its discretion by terminating Father's parental rights where there is no clear and convincing evidence that Father has evidenced a settled purpose of relinquishing parental claim to the child or has refused or failed to perform her parental duties?

3. Did the Trial Court err[] as a matter of law and abuse its discretion by terminating Father's parental rights as there was insufficient evidence presented to break the bond the child shared with Father and where there was no clear and convincing evidence that the child would not be harmed by the termination of Father's parental rights?

4. Did the Trial Court err[] as a matter of law and abuse its discretion when it changed the child's goal to adoption as substantial, sufficient, and credible evidence was presented at the time of trial which would have substantiated denying the Petition for Goal Change?

Father's Br. at 4.

In matters involving involuntary termination of parental rights, our standard of review is as follows:

> The standard of review in termination of parental rights cases requires appellate courts "to accept the findings of fact and credibility determinations of the trial court if they are supported by the record." *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). "If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion." *Id.* "[A] decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* The trial court's decision, however, should not be reversed merely because the record would support a different result. *Id.* at 827. We have previously emphasized our deference to trial courts that often have first-hand observations of the parties spanning multiple hearings. *See In re R.J.T.*, 9 A.3d [1179, 1190 (Pa. 2010)].

*In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013); *see also In re Adoption of S.P.*, 47 A.3d 817, 826-27 (Pa. 2012) ("[E]ven where the facts could

- 5 -

support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment.").

The termination of parental rights is governed by Section 2511 of the Adoption Act, 23 Pa.C.S. §§ 2101-2938, which requires a bifurcated analysis:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child.

*In re L.M.*, 923 A.2d 505, 511 (Pa.Super. 2007) (citations omitted). We have defined clear and convincing evidence as that which is so "clear, direct, weighty and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *In re C.S.*, 761 A.2d 1197, 1201 (Pa.Super. 2000) (*en banc*) (quoting *Matter of Adoption of Charles E.D.M. II*, 708 A.2d 88, 91 (Pa. 1998)).

In this case, the trial court terminated Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(1), (2), (5), (8), and (b). To affirm a termination of parental rights, we need only agree with the trial court as to any one subsection of Section 2511(a), as well as Section 2511(b). *In re*

- 6 -

*B.L.W.,* 843 A.2d 380, 384 (Pa.Super. 2004) (*en banc*). Here, we analyze the court's decision to terminate under Sections 2511(a)(2) and (b), which provide as follows:

> **(a) General rule.--**The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:
>
> . . .
>
> > (2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.
>
> . . .
>
> **(b) Other considerations.--**The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent. With respect to any petition filed pursuant to subsection (a)(1), (6) or (8), the court shall not consider any efforts by the parent to remedy the conditions described therein which are first initiated subsequent to the giving of notice of the filing of the petition.

23 Pa.C.S. § 2511(a)(2) and (b).

We first address whether the trial court abused its discretion by terminating Father's parental rights pursuant to Section 2511(a)(2). This Court has stated:

> In order to terminate parental rights pursuant to 23 Pa.C.S.[] § 2511(a)(2), the following three elements must be met: (1) repeated and continued incapacity, abuse, neglect or refusal; (2)

such incapacity, abuse, neglect or refusal has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being; and (3) the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied.

*In re Adoption of M.E.P.*, 825 A.2d 1266, 1272 (Pa.Super. 2003). "The grounds for termination due to parental incapacity that cannot be remedied are not limited to affirmative misconduct. To the contrary, those grounds may include acts of refusal as well as incapacity to perform parental duties." *In re Adoption of C.D.R.*, 111 A.3d 1212, 1216 (Pa.Super. 2015) (quoting *In re A.L.D.*, 797 A.2d 326, 337 (Pa.Super. 2002)).

In finding sufficient evidence supporting termination of Father's parental rights pursuant to Section 2511(a)(2), the trial court in this case stated as follows:

> Child was taken into DHS custody because Father was unable to provide essential parental care: he lived in a house without enough room for him and Child; was not keeping Child's medical needs updated; had substance abuse problems; and would leave Child in the care of paternal aunt, who had a lengthy criminal history. Father is unable to remedy the causes of his repeated and continued incapacity to provide Child with essential parental care, control, or subsistence necessary for Child's physical and mental well-being. Father did not successfully complete his [family service plan ("FSP")] objectives. Father continues to live in the same home that DHS deemed inadequate throughout the lifetime of the case and from which Child was removed. Father was ordered by the trial court and DHS referred him to CEU for drug and alcohol treatment. Father [wa]s unable to attend and complete any drug and alcohol programs. At the time of the termination trial, Father was not enrolled in any drug or alcohol program. Father continues to test positive for cocaine and marijuana, his drugs of choice. Father has not verified his employment. He completed the program

at ARC, but he is not making any effort to find a job. Father never progressed to unsupervised visits and only attended roughly seventy-four percent of the weekly visits. Father's visits need to be supervised since he sometimes dozes off. Father has failed to take affirmative steps to place himself in a position to parent Child. Child needs permanency, which Father cannot provide. Father is unable to be the sole caretaker of Child. Therefore, DHS met its burden under §2511(a)(2) of the Adoption Act and termination under this section was also proper.

1925(a) Op. at 8-9 (citations to record omitted).

Father argues that he has made efforts to complete his FSP goals. Father's Br. at 12. Father states that he completed parenting and anger management classes and a housing and life skills workshop, and, although unable to provide proof of employment, Father stated that he works "under the table." *Id.* at 12-13. Father also asserts he has attended a majority of visitations with Child and had appropriate interaction with Child. *Id.* at 13. Lastly, Father notes he participated in a drug and alcohol treatment program for 2½ to 3 months, which he was unable to complete due to deaths in the family, and missed drug screens because he lost his phone. Father does not believe he has a drug problem and contests a positive drug screen from October 7, 2016; however, he is willing to attend a treatment program. *Id.* at 13.

Upon review, we conclude that the record supports the trial court's termination of Father's parental rights pursuant to Section 2511(a)(2). Father failed to complete his established FSP goals. DHS caseworker Yolanda Bronson-Williford, recounted Father's FSP goals as visitation,

compliance with CEU, housing, employment, and parenting.[6]  N.T., 1/11/17, at 35, 38, 44.  Ms. Bronson-Williford testified that she discussed these goals with Father at an October 7, 2016 hearing.[7]  *Id.* at 36.  She further confirmed no indication that Father did not understand these goals.  *Id.* at 36-37.  Ms. Bronson-Williford described Father's compliance as "minimal." *Id.* at 40.  When asked for an explanation why, she stated:

> Because it seems like Father has had the same goal since [Child] has been in placement.  He has had the same goals of housing, employment -- Father did make some -- well, let me finish.  He had the same goals of housing, employment, CEU, visitation, parenting -- well the parenting capacity was later on, Your Honor.
>
> But he was able to do a couple of things, which is anger management and parenting through ARC.  But that's -- that's been 2½ years, so he hasn't progressed to the point where I think he needs to be to the point of more anything [sic] more than minimum.

*Id.* at 40-41.

Although Father completed a housing and life skills workshop, *id.* at 33, he remained in the same housing deemed inappropriate for Child.  *Id.* at 37, 45, 54-55, 62-64.  Further, despite testifying that he worked "under the table," Father presented no confirming documentation as to employment.

---

[6] Father completed parenting classes.  N.T., 1/11/17, at 33, 35, 71.

[7] Ms. Bronson-Williford additionally advised Father of an FSP meeting scheduled for October 19, 2016, which he did not attend.  N.T., 1/11/17, at at 36.

*Id.* at 11, 45-46, 62, 88. In addition, although Father maintained "fairly consistent" visitation with "appropriate" interactions with Child,[8] *id.* at 57, 65-66, visitation remained supervised, *id.* at 39, 57-58. Significantly, Ms. Bronson-Williford further testified that she would not recommend progression to unsupervised visitation. *Id.* at 39-40. She testified as follows:

> Well, since – when I reviewed the record it seems like since [Child] has been in placement, Your Honor, [Father] has not successfully completed CEU goal of randoms being clean. And that's one of our issues regarding -- a safety regarding the children.
>
> He has been in care over 2½ years, so -- and he still has supervised visits, so I am not in agreement with -- at this time, for him to progress to unsupervised.

*Id.* at 40. Ms. Keegan similarly stated that she would not expand Father's visitation. *Id.* at 72.

Moreover, and most importantly, Father never successfully completed drug and alcohol treatment. *Id.* at 44, 61, 78. Although Father commenced drug and alcohol treatment at The Wedge North, he was discharged due to noncompliance.[9] *Id.* at 30, 94-95. Subsequent to discharge, Father has not engaged in treatment. *Id.* at 37, 95-96. He also failed to present for

---

[8] Children's Choice caseworker Juliana Keegan, who scheduled and supervised the visits, reported attendance at roughly seventy-four percent of visits. N.T., 1/11/17, at 57.

[9] Father was previously referred to the NET, but failed to engage in treatment. N.T., 1/11/17, at 98-99; *see also* DHS Exhibit 15.

requested drug screens.[10]  *Id.* at 37.  Critically, his last drug screen from October 7, 2016 was positive for cocaine and marijuana.[11]  *Id.* at 30-31; *see also* DHS Exhibit 12.  Although Father stated that he would be willing to engage in treatment, he testified that he does not believe he has a drug problem.  *Id.* at 78-79.

In response to inquiry as to providing Father more time to complete his objectives, Ms. Keegan expressed, "It's been a long time that [Child] has been in care.  And I believe that to prolong this process may be to the child's detriment.  It's a difficult process for a child to be in and it's going on 3 years."  *Id.* at 70.  As this Court has stated, "[A] child's life cannot be held in abeyance while a parent attempts to attain the maturity necessary to assume parenting responsibilities.  The court cannot and will not subordinate indefinitely a child's need for permanence and stability to a parent's claims of progress and hope for the future."  *In re Adoption of R.J.S.*, 901 A.2d 502, 513 (Pa.Super. 2006).

Accordingly, we conclude that the trial court did not abuse its discretion in concluding that Father's repeated and continued incapacity, abuse, neglect, or refusal has caused Child to be without essential parental

_____

[10] Father challenged receipt of the drug screen requests, explaining that he lost his telephone for a period of time.  N.T., 1/11/17, at 79.

[11] Father contested the results of this drug screen.  N.T., 1/11/17, at 94.

control or subsistence necessary for his physical and mental well-being and that Father cannot or will not remedy this situation. *See In re Adoption of M.E.P.*, 825 A.2d at 1272.

We next determine whether termination was proper under Section 2511(b). With regard to Section 2511(b), we have stated as follows:

> Section 2511(b) focuses on whether termination of parental rights would best serve the developmental, physical, and emotional needs and welfare of the child. As this Court has explained, Section 2511(b) does not explicitly require a bonding analysis and the term 'bond' is not defined in the Adoption Act. Case law, however, provides that analysis of the emotional bond, if any, between parent and child is a factor to be considered as part of our analysis. While a parent's emotional bond with his or her child is a major aspect of the subsection 2511(b) best-interest analysis, it is nonetheless only one of many factors to be considered by the court when determining what is in the best interest of the child.
>
> > [I]n addition to a bond examination, the trial court can equally emphasize the safety needs of the child, and should also consider the intangibles, such as the love, comfort, security, and stability the child might have with the foster parent. Additionally, this Court stated that the trial court should consider the importance of continuity of relationships and whether any existing parent-child bond can be severed without detrimental effects on the child.

*In re Adoption of C.D.R.*, 111 A.3d 1212, 1219 (Pa.Super. 2015) (quoting *In re N.A.M.*, 33 A.3d 95, 103 (Pa.Super. 2011)) (quotation marks and citations omitted).

In concluding that termination of Father's parental rights favored Child's needs and welfare, the court reasoned:

Father's visits with Child were always supervised; he never progressed to unsupervised visits. Father also only attended seventy-four percent of his weekly visits with Child. Child transitions from Father's visits to his foster home smoothly; Child does not get upset and is well-behaved. Child occasionally, but not infrequently, asked to go home to the foster parent during visits with Father. Father and Child do not have a parental bond, and Child would not suffer permanent harm if Father's parental rights were terminated. Adoption is in Child's best interests. The DHS social worker testified that Child views the foster parent as the parental figure who takes care of all Child's needs. Child is bonded with the foster parent and calls her "Mom." Father does not inquire about Child's medical or educational needs. Child is in a safe, permanent, and pre-adoptive home. DHS witnesses were credible. Consequently, the trial court did not abuse its discretion when it found, by clear and convincing evidence, that there was no parental bond and that termination of Father's parental rights would not destroy an existing beneficial relationship.

1925(a) Op. at 12-13.

Father argues that he and Child "share a beneficial bond that should not be destroyed through termination of Father's parental rights." Father's Br. at 19. Father highlights that Child recognizes him and calls him "dad" and that the CUA caseworker noted a relationship. *Id.*

We conclude that the record supports the trial court's finding that Child's developmental, physical and emotional needs and welfare favor termination of Father's parental rights pursuant to Section 2511(b).

Although Ms. Keegan acknowledged a relationship between Father and Child, noting recognition and positive interaction, she could not say there was a bond. *Id.* at 64-66. Rather, Child is in a pre-adoptive home where he enjoys a nurturing, parent-child relationship with his foster mother. *Id.* at 41-42, 56, 74. As described by Ms. Bronson-Williford, "[Child] sees

[foster mother] as -- he calls her 'Mommy[.']  He sees her as the person who takes care of his needs, consoles him, takes him to the doctor, educates him.  They go out for different family events:  Disney on Ice, circus.  So he has, like, a great bond with [foster mother]." *Id.* at 41-42.  He additionally has a "wonderful relationship" with his foster sibling.  *Id.* at 42.  This was echoed by Ms. Keegan.  *Id.* at 56.  Notably, Ms. Keegan acknowledged that Father did not inquire as to Child's medical and educational concerns.  *Id.* at 56-57.  Likewise, she referenced a "smooth transition" from Father back to foster mother after visitation, noting Child "does not get upset." *Id.* at 58.  Ms. Keegan also testified to occasions where Child has asked to go home during visits.  *Id.*

As such, Ms. Keegan did not believe Child would suffer irreparable harm if visitation with Father were to end or if his rights were terminated. *Id.* at 59.  In fact, as Child had been in his foster home for 2½ years, she expressed that he would suffer harm if removed.  *Id.* at 60.  Further, both Ms. Bronson-Williford and Ms. Keegan opined that adoption was in Child's best interests.  *Id.* at 43, 59-60.  Ms. Bronson-Williford offered,

> [Child] needs -- has been in care for a long time and he needs permanency for -- in order for him to progress. There has not been compliance regarding -- I mean, enough compliance for us to progress to unsupervised visits with the [f]ather.  And he -- [Child] just needs permanency to the point where he can continue with his life.  I think he knows Father, but he doesn't know his father as the person to take care of all his needs.

*Id.* at 43.

Accordingly, we conclude that the trial court did not abuse its discretion in concluding that termination of Father's parental rights serves Child's developmental, physical and emotional needs and welfare.

Lastly, we turn to the question of whether the trial court appropriately changed the permanency goal to adoption. In so doing, our standard of review is the same abuse of discretion standard as noted above. *See In re R.J.T.*, 9 A.3d 1179, 1190 (Pa. 2010); *In re S.B.*, 943 A.2d 973, 977 (Pa.Super. 2008).

This Court has stated:

> Pursuant to § 6351(f) of the Juvenile Act, when considering a petition for a goal change for a dependent child, the juvenile court is to consider, *inter alia:* (1) the continuing necessity for and appropriateness of the placement; (2) the extent of compliance with the family service plan; (3) the extent of progress made towards alleviating the circumstances which necessitated the original placement; (4) the appropriateness and feasibility of the current placement goal for the children; (5) a likely date by which the goal for the child might be achieved; (6) the child's safety; and (7) whether the child has been in placement for at least fifteen of the last twenty-two months. The best interests of the child, and not the interests of the parent, must guide the trial court. As this Court has held, a child's life simply cannot be put on hold in the hope that the parent will summon the ability to handle the responsibilities of parenting.

*In re A.B.*, 19 A.3d 1084, 1088-89 (Pa. Super. 2011) (citations and quotation marks omitted).

Additionally, Section 6351(f.1) requires the trial court to make a determination regarding the child's placement goal:

> **(f.1) Additional determination.**—Based upon the determinations made under subsection (f) and all relevant evidence presented at the hearing, the court shall determine one of the following:
>
> . . .
>
> (2) If and when the child will be placed for adoption, and the county agency will file for termination of parental rights in cases where return to the child's parent, guardian or custodian is not best suited to the safety, protection and physical, mental and moral welfare of the child.

42 Pa.C.S. § 6351(f.1).

Here, Father argues that it was not in Child's best interests for the trial court to change Child's permanency goal to adoption. Father's Br. at 19. Father highlights the bond between him and Child, as well as his efforts at completion of his FSP goals. *Id.* at 19-20. Father argues as follows:

> Father and Child share a bond evidenced by the fact that Child recognizes Father and calls him dad. Furthermore, the case worker, Juliana Keegan also testified that there is a relationship between Father and Child. As such, breaking this bond and forever breaking apart this family is not in the best interest of the child. This is especially true as testimony was offered that there were no safety concerns during Father's weekly visits with Child.
>
> In addition, Father has worked towards his FSP goals . . . in an attempt to remedy any other situations that might have previously created a safety issue for the child. As such changing [C]hild's permanency goal from reunification to adoption was against the weight of the evidence.

*Id.* (citations to record omitted).

We conclude that Father's claim lacks merit. The record reveals that a change of the permanency goal to adoption was in Child's best interests.

Father had not successfully completed and was not currently engaged in drug and alcohol treatment. N.T., 1/11/17, at 30, 37, 44, 61, 78, 94-96. Further, Father had failed to present for screenings, *id.* at 37, and, when last screened on October 7, 2016, he tested positive for cocaine and marijuana. *Id.* at 30-31; DHS Exhibit 12. Additionally, despite a relationship with Father, Child's parent-child relationship is with his foster mother. *Id.* at 41-42, 56, 64-66. Therefore, the record supports that a goal change was in the best interests of Child. Accordingly, after review of the record, we discern no abuse of discretion, and conclude that the trial court properly changed Child's permanency goal to adoption.

Based on the foregoing analysis of the trial court's termination of Father's parental rights and change of the Child's permanency goal, we affirm the decree and order of the trial court.

Decree and order affirmed.

*Judgment Entered.*

_____
*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: <u>*9/26/2017*</u>